## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

WILLIAM FAIRBANKS,

               Plaintiff,                             CASE NO. _____

vs.

HILLSBOROUGH COUNTY,                       **JURY TRIAL DEMANDED**
FLORIDA,

               Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, William Fairbanks ("Fairbanks"), through his counsel, files this Complaint and Demand for Jury Trial against Hillsborough County, Florida (hereafter "Defendant"), and in support thereof states as follows:

### NATURE OF ACTION

1.      This is an action arising from and seeking redress for violations of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq*. (hereafter the "ADA"), through acts of discrimination and retaliation.

### JURISDICTION AND VENUE

2.      Jurisdiction in this Court is proper as Fairbanks is bringing this action pursuant to the ADA, thereby raising a federal question over which this Court possesses original jurisdiction.

3.      Venue is proper here because all or a substantial part of the events or omissions giving rise to this cause of action took place in this judicial district.

### PARTIES

4.      Fairbanks is a resident of Pasco County, Florida, and was employed as a Detention Deputy with Defendant through the Hillsborough County Sheriff's Office ("HCSO").

5.      Defendant is a public employer with approximately 900+ employees at the HCSO.

6.      Until February 24, 2020, Fairbanks was employed with Defendant.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

7.      Fairbanks timely filed his charge (November 26, 2018) and amended charges (July 30, 2019, April 8, 2020) with the United States Equal Employment Opportunity Commission (the "EEOC") and with the Florida Commission on Human Relations (the "FCHR") relating to ADA discrimination, failure to accommodate, and retaliation.

8.      Ultimately, the EEOC issued its Dismissal and Notice of Rights on October 9, 2020.

9.      Fairbanks has satisfied all administrative procedures that were conditions precedent to filing this cause of action pursuant to state and federal law.

## FACTUAL ALLEGATIONS

10.      Fairbanks began working for the Defendant on May 22, 1997.

11.      Fairbanks worked in the Orient Road Jail and most recently in the Central Booking department ("Booking") within the HCSO.

12.      Fairbanks has historically performed all his job responsibilities in Booking without incident as stipulated in all his yearly performance evaluations.

13.      Fairbanks has a chronic condition, osteoarthritis, which is qualified disability pursuant to the ADA (hereinafter "Qualified Disability").

14.      In treating this Qualified Disability, Fairbanks's rheumatologist has prescribed him Tylenol #4, which he has taken without incident for over ten years.

15.      The use of Tylenol #4 was first reported by Fairbanks to Defendant in 2010.

16.      Fairbanks was selected for a random drug screen in 2010, which also revealed Tylenol #4.

17.     After the drug screen, Fairbanks was asked about his use of Tylenol #4, to which he stated it was prescribed by his rheumatologist for his Qualified Disability (verified and acknowledged by the doctor and lab used at Helen Ellis Hospital in Tarpon Springs, Florida).

18.     Fairbanks also disclosed his use of Tylenol #4 to Defendant after an arthritis related surgery in 2015 and an infectious disease exposure while on duty in 2017.

19.     Fairbanks administers his medication early in the morning before his scheduled shift and again after his shift ends.

20.     He has never been impaired at work while on his prescribed medication and does not have a substance abuse issue, as verified by substance abuse professionals.

21.     On June 18, 2018, Fairbanks told HCSO's occupational health clinical director, doctor Toni Belisle ("Belisle") about a recent injury to his tailbone, and that he had been prescribed Tylenol #4 for pain associated with that injury.

22.     In April of 2018, after telling Belisle of his Qualified Disability, she contacted Fairbanks' rheumatologist with instructions to stop prescribing Tylenol #4 and began monitoring his prescriptions.

23.     On August 1, 2018, after Fairbanks's Tylenol #4 prescription was refilled, Belisle confronted Fairbanks, who told her again that he took Tylenol #4 as prescribed, for his Qualified Disability.

24.     Belisle immediately removed Fairbanks from duty and sent him to a drug treatment counselor and assumed incorrectly that Fairbanks had an addiction to Tylenol #4 and stated he had "relapsed."

25.     Fairbanks met with a drug treatment counselor selected by Defendant, who determined he did not have a substance abuse issue.

3

26.     On August 24, 2018, Fairbanks's treating physicians submitted paperwork for reasonable accommodation to Defendant and Dr. Belisle for use of prescribed medications, which was ultimately denied.

27.     On November 29, 2018, Fairbanks was removed from his regularly assigned post and met with Colonel Wayne Bunton in the Administration Building.

28.     He reported as instructed and met with Captain Palazzi, Major Moore, and Colonel Bunton.

29.     Fairbanks was informed that he was being placed on administrative leave, pending the outcome of an investigation based on a complaint filed by Dr. Toni Belisle relating to his taking prescribed medication.

30.     He was instructed to give up his credentials and keys and drive straight home to wait for Captain Palazzi to pick up his uniforms, equipment, and agency issued gear.

31.     Captain Palazzi showed up three hours later and all items were returned as requested.

32.     On January 7, 2019, Fairbanks received a call from Corporal S. Portalatin and asked if he could meet with him at 2:30 p.m. that day to discuss what to expect after the start of HCSO's investigation.

33.     When Fairbanks arrived for the meeting at the Sheriff's Office Operation Center in Ybor City, he attempted to enter into the building but was told he needed to wait at the gate for an escort and to leave his driver's license with the deputy posted at that position.

34.     Then, Fairbanks was issued a sticker that read "VISITOR" and "ESCORT REQUIRED."

35.     After 21 years of dedicated service, he was treated as if he never worked for Defendant, and was deeply embarrassed and humiliated.

36.     At the conclusion of the meeting, Corporal Portalatin asked if Fairbanks would get a drug screen.

37.     He complied but, tellingly, Fairbanks never received any results nor were they ever discussed throughout this process.[1]

38.     On January 10, 2019, Fairbanks returned to Defendant with a representative, Ron Ludwin, with the stated reason for the meeting to answer questions based on the allegations made by Dr. Belisle about alleged drug abuse.

39.     After being escorted into the building again, Fairbanks and his representative were met by Corporal Portalatin.

40.     After explaining the process and being sworn in, the questioning by Corporal Portalatin was more of an interrogation regarding the use of the prescribed medication of Fairbanks rather than work performance, which is against HCSO policy.

41.     There were also questions concerning the identities of anyone with the HCSO or Defendant who knew Fairbanks was taking his prescribed medication, which were answered.

42.     The interrogation went on for approximately a little over two hours, after which Fairbanks and his representative were escorted out of the building.

43.     On February 12, 2019, Corporal Portalatin called Fairbanks's cell phone, his home phone, and sent an email, all in an effort to set up another interview, which was ultimately scheduled for February 13, 2019.

44.     On the day of the meeting, Fairbanks returned to the HCSO with his representative.

---

[1] Defendant initially attempted to impose discipline on Fairbanks based upon initial drug screen results, but later abandoned that effort.

45.     The second meeting, like the first, was an interrogation conducted by Corporal Portalatin regarding the allegation made by Belisle against Fairbanks.

46.     On March 20, 2019, Fairbanks received a phone call from Wendy Stanek, the administrative secretary at the HCSO, to set up a meeting with Colonel Bunton.

47.     Specifically, Stanek told Fairbanks, "The Colonel needs to see you and would like for you to be here at 1 o'clock on Friday."

48.     Although scheduled, the meeting was later cancelled by Colonel Bunton.

49.     A meeting with Captain Janos was then scheduled to occur at the Orient Road jail on May 2, 2019.

50.     On that date, Fairbanks arrived for the meeting and attempted to go to Captain Janos's office but was told to wait and be escorted back by Corporal Herr, causing him embarrassment with coworkers.

51.     During the meeting, Captain Janos presented some paperwork and read the contents.

52.     Fairbanks disagreed with the contents of the paperwork and requested that a hearing with Major Moore be conducted.

53.     Fairbanks met with Major Moore on May 7, 2019.

54.     In essence, the meeting was called to see if Fairbanks would agree to their sanctions and when it became clear to them that he would not, the matter progressed to a five-member panel.

55.     On May 17, 2019, Fairbanks addressed the five-member panel via telephone regarding an alleged violation of HCSO Rule 4.5.05, Use of Prescribed Drugs While on Duty, which provides for an oral warning or one day suspension if there is a sustained violation based on their opinions.

56.     However, despite this, the panel recommended a two-day suspension, recommended that Fairbanks submit to a drug screen each month for twelve months, and that a substance abuse professional be appointed to evaluate him prior to his return to duty.

57.     Although Fairbanks was on administrative leave with pay, he was not awarded a merit increase provided to others employed by Defendant.

58.     On June 18, 2019, Fairbanks was scheduled for a disciplinary hearing conducted with HCSO command staff and legal.

59.     Despite the fact that HSCO had been notified several times of Fairbanks' use of his legally prescribed medications, their review ultimately resulted in a recommendation for a two-day suspension for improper notification of the use of a lawfully prescribed medication by Fairbanks.

60.     The discipline did not require Fairbanks to submit to a drug screen each month for twelve months, nor did it require that that a substance abuse professional would be appointed to evaluate him prior to his return to duty, both of which were recommended by the five-member panel.

61.     On June 19, 2019, Fairbanks received a personal phone call from Colonel Bunton and he requested that Fairbanks see an independent doctor to be evaluated for a fitness for duty.

62.     Colonel Bunton stated there was "no doubt" Fairbanks would pass the physical and be placed back on the floor in Booking "where you belong."

63.     He said Nikki Smith, Defendant's Risk Management Director, was already looking for an independent doctor so that Fairbanks could "get back to work."

64.     On June 22, 2019, although no fitness for duty had been conducted, Fairbanks was asked to return to work by Colonel Bunton, but not to his regularly assigned post "on the floor."

65.     Instead, he was assigned to the Master Control Center, a post he had never been assigned to in the past.

66.     Fairbanks was required to wear civilian clothes and was not given his regular duty gear.

67.     During his return, he performed all assigned duties without incident and continued to take his prescribed medication early in the morning several hours before his shift, and after his shift concluded, just as he had done for the past decade.

68.     On June 25, 2019, Fairbanks received a phone call from Sergeant Portalatin to set a date (July 1, 2019) to sign paperwork and complete the investigation file.

69.     On June 26, 2019, Fairbanks began his suspension to be completed early morning on June 27, 2019.

70.     On June 27, 2019, Fairbanks met with the physician, Dr. Yemi Owi ("Owi"), who was selected by Defendant to conduct a fitness for duty.

71.     Owi was not independent – she had prior professional dealings with Belisle.

72.     Moreover, Fairbanks was not evaluated.

73.     Fairbanks was simply asked to sign a release so the physician could review his medical records.

74.     On July 1, 2019, Fairbanks arrived at work and spoke with Sergeant Mitchell about going to Professional Standards and signing paperwork so that he could get back to work.

75.     She asked how his appointment with the counselor went.

76.     Fairbanks informed her it was supposed to be a doctor evaluation but all they requested was medical records.

77. On July 10, 2019, Fairbanks sent Captain Janos an email in an attempt to transfer to a Releasing Deputy position.

78. Captain Janos's response was, "Hey sir, unfortunately, you don't meet the listed qualifications as it pertains to sustained disciplinary."

79. So, in essence, Fairbanks did not meet the qualifications because he was disciplined (two-day suspension) for taking a legally prescribed medication that the HCSO and Defendant had been aware of for many years.

80. On July 18, 2019, Fairbanks received Owi's recommendations via work email.

81. Specifically, Owi set forth two options to Defendant as it relates to Fairbanks' continued employment: (1) transfer to a position that is not considered a safety sensitive position, or (2) enroll in a medically supervised opiate dependence treatment program so that Fairbanks could be withdrawn from opiate use on a non-narcotic pain medication.

82. Owi concluded, "For the Sheriff health department, I recommend the assistance of a substance abuse professional."

83. This recommendation to Defendant fundamentally conflicted with what Fairbanks' personal physicians and specialists had already determined and assessed – that he has no substance abuse issue and could return to work.

84. Although Owi made her recommendations "for the Sheriff health department," Fairbanks was told by Major Moore that he must select one of the two options and that he was required to do so by August 7, 2019.

85. However, if Fairbanks selected option 1, it would be an admission that he could not perform his job duties "on the floor," which is false.

86.     If he selected, option 2, it would be an admission that he has a substance abuse issue, which is also false and has been rejected by substance abuse professionals.

87.     October 7, 2019, Fairbanks was granted camera access at the jail facility by Colonel Poore to maintain compliance with his current assignment only to have it removed by Captain Janos on January 28, 2020.

88.     On October 16, 2019, Fairbanks again requested an accommodation from Defendant.

89.     Specifically, he requested that he be allowed to take his prescribed medication (Tylenol #4) before his scheduled shifts and that he be returned to his prior position because his then-current position required him to engage in repeated mechanical movements which exacerbated his condition.

90.     On October 30, 2019, Fairbanks met with Major Moore and Captain Janos, and was asked to provide his selection of one of the two recommendations Owi had given to Defendant regarding Fairbanks by no later than November 12, 2019.

91.     There was not an order by Major Moore during the meeting that Fairbanks personally provide his response to her.

92.     During the October 30 meeting, Fairbanks again asked for his uniforms.

93.     In response, Major Moore told him that she was not going to "purchase any right now."

94.      Later that day, Major Moore sent Fairbanks an email that explained, in part, "You were given a direct order to inform me of your decision by the required date, November 12, 2019."

95.    The next day, on October 31, 2019, Major Moore and HCSO counsel, through Fairbanks' counsel, were provided his response to the Owi recommendations via correspondence that was mailed and emailed.

96.    Specifically, it was explained that if Fairbanks selected the first option, it would be a false admission that he could not perform his job duties as a deputy "on the floor," and if he selected, recommendation 2, it would also be a false admission that he has a substance abuse issue, which was rejected by the HCSO recommended EAP substance abuse professional and several other highly regarded medical professionals.

97.    As a result, Major Moore, the HCSO counsel, and Defendant were told that Fairbanks could not in good faith select either of the recommendations provided to the HCSO by Dr. Owi.

98.    At that time, Fairbanks also renewed his request that he be returned to his prior position, as he was guaranteed by Colonel Bunton after the conclusion of a physical that was to be completed by an independent doctor, to which never occurred.

99.    He also again requested his uniforms and gear, which were never received.

100.    At no time following the October 31 communication in compliance with Major Moore's order and the November 12 deadline established by her, did she attempt to make contact with Fairbanks and tell him she expected that he personally (as opposed to through counsel) tell her of his decision regarding Owi's recommendations.

101.    On November 5, 2019, Fairbanks' October 16 accommodation request was denied.

102.    On November 11, 2019, having been given no response by Major Moore following Fairbanks' communication (through counsel) regarding the Owi recommendations, Fairbanks

again (through counsel) notified Defendant (through HCSO counsel) of his response to Major Moore's October 30 order.[2]

103.    On November 19, 2019, Fairbanks asked Lieutenant Kolka about his participation in the shift BID process.

104.    Lieutenant Kolka explained that, due to his current circumstances, Fairbanks would not be allowed to participate in the BID process per Captain Janos.

105.    Fairbanks sent Captain Janos an email regarding the issue and, the next day Fairbanks was told he could bid for the new shift in a deputy position.

106.    Ultimately, Fairbanks was denied the deputy position.

107.    On November 20, 2019, Fairbanks was placed under investigation again for allegedly not complying Major Moore's order to select one of the two options presented to Defendant by Owi.

108.    However, Major Moore received Fairbanks's decision on October 31 and, through HCSO counsel, on two other occasions thereafter.

109.    Additionally, HSCO Rule 5.1.04 (Compliance with a direct order of a superior) provides, in part, that sheriff's personnel "shall not refuse to comply [with an order] when such orders are lawful and proper."

110.    The order of Major Moore requested that Fairbanks either admit that he cannot perform his job duties on the floor or that he has a substance abuse issue, both of which are false.

111.    The October 30 order by Major Moore is not "lawful or proper," as contemplated by Rules and Regulations 5.1.04.

---

[2] Fairbanks (through counsel) would again notify Defendant (through HCSO's counsel) of his decision regarding the Owi recommendations.

112.     On February 24, 2020, Chief Deputy Donna Lusczynski upheld the decisions of her command staff and Fairbanks was ultimately terminated later that day.

113.     This was in retaliation for the filing of his charges, requesting accommodations, and having otherwise engaged in protected activity, and because Defendant regarded Fairbanks, erroneously, as illegally using drugs instead of recognizing he was legally using a drug as prescribed for any underlying condition.

## COUNT I: AMERICANS WITH DISABILITIES ACT, AS AMENDED, 42 U.S.C. § 12101 *et seq.* (DISABILITY (ACTUAL OR PERCEIVED) DISCRIMINATION)

114.     Fairbanks hereby incorporates the allegations set forth in paragraphs 1 through 113 by reference.

115.     Fairbanks is a qualified individual with a disability and/or handicap under the ADA. Specifically, Fairbanks was diagnosed with osteoarthritis, which affected both his major life activities and major bodily functions.

116.     At all times material hereto, Fairbanks was qualified to perform the essential functions of his position with or without reasonable accommodations.

117.     Defendant discriminated against Fairbanks on the basis of his disability by subjecting Fairbanks to constant harassment, unjustified investigations, wrongful accusations, deliberate and intentional negligence, and then, ultimately, termination of his employment.

118.     As a direct, proximate, and foreseeable result of Defendant's discriminatory actions, Fairbanks has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

119.     The actions of Defendant make reinstatement ineffective as a make whole remedy, entitling Fairbanks to front pay in lieu of reinstatement.

120.     Fairbanks has retained counsel to represent him in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Fairbanks demands judgment against Defendant for:

a.      Back pay;

b.      Front pay;

c.      Compensatory damages;

d.      Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 12205; and

e.      Such other relief as this Court deems just and proper.

## COUNT II: AMERICANS WITH DISABILITIES ACT, AS AMENDED, 42 U.S.C. § 12101 *et seq.* (FAILURE TO ACCOMMODATE)

121.     Fairbanks hereby incorporates the allegations set forth in paragraphs 1 through 14, 26, 88, 89 and 101 of the Complaint as if fully set forth herein.

122.     Fairbanks is a qualified individual with a disability and/or handicap under the ADA. Specifically, Fairbanks was diagnosed with osteoarthritis, which affected both his major life activities and major bodily functions.

123.     At all times material hereto, Fairbanks was qualified to perform the essential functions of his position with or without reasonable accommodations.

124.     Defendant failed to provide reasonable accommodations for Fairbanks' disability when presented medical documentation and proof of an existing condition qualified under the ADA.  Fairbanks's accommodations were all denied.

125.     As a direct, proximate, and foreseeable result of Defendant's discriminatory actions, Fairbanks has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

126.     The actions of Defendant make reinstatement ineffective as a make whole remedy, entitling Fairbanks to front pay in lieu of reinstatement.

127.     Fairbanks has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Fairbanks demands judgment against Defendant for:

a.     Back pay;

b.     Front pay;

c.     Compensatory damages;

d.     Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 12205; and

e.     Such other relief as this Court deems just and proper.

## COUNT III: AMERICANS WITH DISABILITIES ACT, AS AMENDED, 42 U.S.C. § 12101 *et seq.* (RETALIATION)

128.     Fairbanks hereby incorporates the allegations set forth in paragraphs 1 through 113 by reference.

129.     Defendant violated the ADA by retaliating against Fairbanks for requesting accommodations and for objecting to the unlawful disability discrimination to which he was being subjected, with such practices constituting unlawful employment practices.

130.   Defendant took adverse employment actions against Fairbanks by refusing to allow uniform of the day, no pay increases, constant humiliation, forced to accept job re-assignment without justification, unfair working conditions due to medical reasons, and then terminating his employment.

131.   The adverse employment actions suffered by Fairbanks were causally related to, and in retaliation for, Fairbanks having engaged in the protected activities of seeking accommodations, and of complaining about, and objecting in good faith to, unlawful disability discrimination as prohibited by the ADA.

132.   As a direct, proximate, and foreseeable result of Defendant's retaliatory actions, Fairbanks has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress and other non-pecuniary losses and intangible injuries.

133.   The actions of Defendant make reinstatement ineffective as a make whole remedy, entitling Fairbanks to front pay in lieu of reinstatement.

134.   Fairbanks has retained counsel to represent him in this matter and has incurred, and will continue to incur, attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Fairbanks demands judgment against Defendant for:

a.   Back pay;

b.   Front pay;

c.   Compensatory damages;

d.   Attorneys' fees and costs of this action pursuant to 42 U.S.C. § 12205; and

e.   Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, William Fairbanks, hereby demands trial by jury on all issues so triable as a matter of right.

Date:   December 28, 2020.

Respectfully submitted,

s/Jill S. Schwartz
Jill S. Schwartz, Esquire
Florida Bar No.  523021
Christopher A. Pace, Esquire
Florida Bar No. 676721
JILL S. SCHWARTZ & ASSOCIATES, P.A.
655 W. Morse Blvd., Suite 212
Winter Park, Florida 32789
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
E-mail: jschwartz@schwartzlawfirm.net
E-mail: cpace@schwartzlawfirm.net
Secondary E-mail: docketing@schwartzlawfirm.net

Attorneys for Plaintiff